# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs November 3, 2015

## STATE OF TENNESSEE v. CORNELIUS BANKS

### Appeal from the Criminal Court for Shelby County
#### No. 12-06091     Lee V. Coffee, Judge

_____

### No. W2014-02195-CCA-R3-CD  -  Filed January 29, 2016

_____

Defendant, Cornelius Banks, appeals his Shelby County convictions for one count of aggravated kidnapping, two counts of especially aggravated kidnapping, one merged count of aggravated rape, one merged count of aggravated sexual battery, three counts of aggravated robbery, one count of aggravated burglary, and one count of employing a firearm during the commission of a dangerous felony. The trial court imposed a sentence of 240 years. Defendant argues (1) that the indictment for one of the counts of aggravated rape was fatally defective and should be dismissed; (2) that the evidence was insufficient to support his convictions and that his kidnapping convictions violated double jeopardy; (3) that the trial court erred in failing to instruct the jury that it could consider one of the witnesses as an accomplice whose testimony must be corroborated; and (4) that the trial court erred in ordering Defendant's sentences to be served consecutively. Upon our review of the record, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which ALAN E. GLENN, J., joined. JAMES CURWOOD WITT, JR., J., concurred in results only.

Josie S. Holland (on appeal), Juni S. Ganguli and David Mays (at trial), Memphis, Tennessee, for the appellant, Cornelius Banks.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Senior Counsel; Amy P. Weirich, District Attorney General; and Raymond J. Lepone and P. Neal Oldham, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

*Factual and Procedural Background*

The Shelby County Grand Jury issued a twelve-count indictment against Defendant and his codefendant, Thomas Artez Davis,[1] for the following offenses: three counts of especially aggravated kidnapping, four counts of aggravated rape (under alternate theories of being armed with a weapon and while being aided or abetted by another), three counts of aggravated robbery, one count of aggravated burglary, and one count of employment of a firearm during the commission of a dangerous felony. The charges stemmed from a home invasion where Defendant, Codefendant Davis, and an unidentified third man bound, assaulted, and robbed Tony Manuel, C.M., and R.J. during an eight- to ten-hour ordeal.[2] C.M. and R.J. were also sexually assaulted with a broomstick. At trial, the following facts were adduced:

C.M. testified that he had inherited a duplex on Orr Street from his father. C.M. lived in one side of the duplex and Mr. Manuel, a friend he had known for four or five years, lived in the other side. C.M. knew R.J. from the neighborhood. C.M. admitted that he sold marijuana out of his home.

On April 27, 2012, C.M., R.J., and Mr. Manuel were hanging out in Mr. Manuel's side of the duplex. Around one o'clock in the morning, three men pulled up in a red car and approached the door. Mr. Manuel recognized one of the men and anticipated that they wanted to buy some marijuana. C.M. knew one of the men as Artez, but he had never seen Defendant or the other man before. While Mr. Manuel and one of the men were in the bedroom getting the drugs, Defendant and Artez pulled out guns. R.J. began to tussle with Artez to get control of the gun, but Artez overpowered him.

The men forced the victims to undress. The men used zip ties to tie the victims' hands and feet. Duct tape was placed over the victims' eyes and mouths. Defendant asked C.M. where the marijuana and money were. C.M. replied that he did not have any more after Defendant removed some money and marijuana from his pants pocket. Defendant told C.M. to stop lying and started hitting him. C.M. felt something hard and heavy, like a bat, hit both of his knees and ankles.

Defendant and the other men took C.M.'s iPhone, a projector, an Xbox 360, some money, his identification, and the marijuana in his pocket. The men went to the other side of the duplex and ransacked the house looking for drugs or money. They returned and continued to demand drugs and money from the victims. C.M. testified that

---

[1] Codefendant Davis testified against Defendant at trial and is not involved in this appeal.

[2] It is the policy of this Court to protect the identities of victims of sexual assaults.

Defendant shoved a red broomstick up his butt. Defendant recorded this on C.M.'s iPhone and threatened that if C.M. went to the police, the video would be uploaded to the video-sharing website YouTube. Defendant also threatened to kill the victims if they went to the police.

C.M. and the other victims were held until about eight or nine o'clock that morning. Before the men left, they cut Mr. Manuel loose. C.M. yelled for help, and a neighbor named Purnell Cayson came across the street and cut the zip ties off of the victims. C.M. testified that he did not call the police because he was afraid for his life and the lives of his mother and sister, who lived at the address on C.M.'s identification.[3]

The next day, April 28, 2012, around seven or eight o'clock in the morning, C.M. was sitting in his living room with Mr. Manuel and Mr. Cayson. A silver car pulled up and Defendant and a man named Christopher Sample got out of the car. Defendant was armed with a black handgun and was threatening to beat C.M. again. C.M. obtained his father's assault rifle from the back of the house. He shot several times through the wall until he saw that he had hit the driver. The car spun in the yard and struck a light pole. C.M. hid the rifle in Mr. Cayson's house.

Later that day, C.M. learned that he was wanted for attempted murder, so he turned himself in to the police. He gave a statement explaining what had happened on April 27. C.M. gave the police consent to search his house and told them where the rifle was located. C.M. was shown a photographic lineup and identified Defendant as the man who robbed him. C.M. also identified Christopher Sample from a photographic lineup. C.M. explained that he had heard Mr. Sample's voice during the robbery near the back of his house and that some items were missing from his backyard, but Mr. Sample was not one of the three men who held the victims at gunpoint.

C.M. identified photographs of the injuries he sustained during the robbery, including abrasions on his wrists and ankles from the zip ties and a burn where C.M. said that Codefendant Davis put out a cigarette on him. With regard to the allegation of rape, C.M. clarified that while "the broom was stuck up [his] butt," it did not actually penetrate his anus. He described the assault as follows: "they were trying to stick it up there, but I guess it wouldn't go, so they just played with it on my - - on my ass." C.M. said that the men were taunting him by saying, "It look[s] like this young nigga [sic] like[s] this shit."

On cross-examination, C.M. admitted that he told police that Mr. Manuel was smoking marijuana with the robbers but insisted that Mr. Manuel was also tied up. C.M. admitted that he told police that four men got out of the red car and approached his house, rather than three. C.M. also admitted that he told police that Artez was in the bedroom

_____

[3] The address on C.M.'s identification was different from the Orr Street address.

getting marijuana and that R.J. was tussling with a different man for the gun. C.M. was not charged with the attempted murder of Defendant or with selling marijuana.

R.J. testified that he was long-time friends with C.M. and Mr. Manuel. On April 27, 2012, he went to Mr. Manuel's side of the duplex to play video games. Around one o'clock in the morning, three men came over asking for Mr. Manuel. Codefendant Davis went to a different room with Mr. Manuel. One of the other men pulled out a gun, and R.J. tussled with him for it. R.J. stopped fighting when the third man, identified as Defendant, also pulled out a gun. The men forced R.J. into another room at gunpoint, told him to lie on the ground, and tied him up with plastic zip ties and duct tape. The men demanded money and took about $60 out of R.J.'s pocket. The men beat R.J. around the head and stomped on his elbows, knees, and ankles. Photographs of R.J.'s injuries were admitted into evidence.

Defendant forced R.J. to snort cocaine while holding him at gunpoint, hitting him in the face when he did not initially comply. Defendant then stripped off R.J.'s clothes and "took his fingers and played with [R.J.'s] buttocks." R.J. explained that Defendant penetrated his buttocks with his index finger. R.J. then felt an object, described as a stick or a bat, placed on his buttocks. Defendant took pictures with C.M.'s iPhone and threatened to post them online if the victims went to the police.

R.J. estimated that he was held for approximately ten hours. After he and the other victims were freed by Mr. Cayson, R.J. went home but did not call the police because he was afraid. R.J. eventually did talk to the police after he heard that C.M. was facing attempted murder charges. R.J. identified Defendant in a photographic lineup as the man who "[s]tuck his finger in between my buttocks."

On cross-examination, R.J. explained that C.M. was asleep in his side of the duplex when the three men initially came to the door looking for Mr. Manuel. R.J. stated that C.M. did not come over until 6:30 or 7:00 in the morning. R.J. could hear C.M. screaming as he was being beaten.

Tony Manuel testified that he lived in one side of C.M.'s duplex. Mr. Manuel knew Defendant and Codefendant Davis from school. Mr. Manuel admitted that marijuana was sold out of his house, though he denied that he was selling it at that time.

On April 27, 2012, Mr. Manuel and R.J. were hanging out when Codefendant Davis came to the door. Mr. Manuel recognized Codefendant Davis and told R.J. to let him in. Codefendant Davis came into the other room and asked Mr. Manuel for some marijuana. Mr. Manuel then heard noises in the front room and saw R.J. tussling with a man he did not recognize. Defendant then came through the door with a gun. Defendant forced Mr. Manuel to empty his pockets, then knocked him down onto the floor.

Mr. Manuel was tied up with duct tape. The men demanded drugs and money. They took Mr. Manuel's money, phone, game system, and identification. When Mr. Manuel told them that he had given them everything he had, they demanded money from R.J. and began beating him. Defendant forced Mr. Manuel to call another marijuana dealer from the neighborhood, but the dealer did not answer. Defendant then called C.M. and forced Mr. Manuel to tell him to come over. Defendant dialed the number for the restrained Mr. Manuel and held the phone to his face. Mr. Manuel estimated that he had been held for four or five hours at that point. Photographs of Mr. Manuel's injuries were admitted into evidence.

When C.M. came over, Mr. Manuel could hear the men demanding money from him and beating him. Mr. Manuel could hear some people go to the other side of the duplex. Someone pulled Mr. Manuel's pants down, but Defendant said, "Naw, don't do that to Tony. . . . [H]e probably ain't going to snitch. . . ." The men then put a broom on R.J.'s butt while recording it on a phone; they threatened to upload it to the internet if he went to the police. Mr. Manuel could hear the men do the same thing to C.M. Mr. Manuel could hear Defendant laughing.

After about ten hours, the men finally left. Defendant cut Mr. Manuel's hands loose. He instructed Mr. Manuel to give the men a few minutes to leave before releasing the other victims. Mr. Manuel's feet were still zip-tied together. Mr. Manuel hopped to the door and saw Mr. Cayson on his porch. He called Mr. Cayson over to untie them.

The next day, Mr. Manuel, C.M., and Mr. Cayson were discussing what had happened when a car pulled up in the yard. Defendant got out of the car with a gun. Mr. Manuel ran to the back of the house and jumped out of the window. Mr. Manuel could hear gunshots but did not see who was shooting. Later, Mr. Manuel heard that the police were looking for him, so he turned himself in. Mr. Manuel identified Defendant, Codefendant Davis, and Christopher Sample in a photographic lineup.

On cross-examination, Mr. Manuel said that Defendant put a "blunt" in his mouth and in R.J.'s mouth, but he denied that he had smoked marijuana with Defendant prior to April 27.

Purnell Cayson testified that he lived across the street from the victims. On the morning of April 27, 2012, Mr. Cayson was getting ready to leave his home when he heard someone calling for him. Mr. Cayson went across the street and saw the victims "tied all up and strapped all up with straps." Mr. Cayson took out his pocket knife and cut the straps off of all three victims. Mr. Cayson described the house as being "totally just destroyed."

The next morning, Mr. Cayson was with C.M. and Mr. Manuel when a man approached the house. Someone said, "Oh, he's back, he's back, he's back." C.M. went to the back of the house and got a rifle. He fired the rifle through the wall and hit the car outside. When they heard the people trying to get away, C.M. stepped out on the porch and continued firing. C.M. took the rifle to Mr. Cayson's house and set it behind a door. The police later came, and Mr. Cayson gave them the gun.

On cross-examination, Mr. Cayson admitted that he went over to C.M.'s house on April 28 in order to smoke marijuana. Mr. Cayson denied that any of the victims told him that they had been raped. Mr. Cayson admitted that he did not call the police either after he untied the victims or after the shooting.

On April 28, 2012, Sergeant Mike Schafer of the Memphis Police Department responded to the firehouse on Chelsea Avenue in regards to two people in a vehicle that had been shot. The two shooting victims had been transported to the hospital before Sergeant Schafer's arrival; Sergeant Schafer later learned that the shooting victims were Defendant and Christopher Sample. At the firehouse, Sergeant Schafer discovered a silver or grey Chevy Malibu with a lot of bullet holes in it.[4] There was a lot of blood both inside the vehicle and on the passenger side door. There was damage to the vehicle consistent with striking a pole. Officers found Mr. Manuel's identification inside the driver's side door and a small bag of marijuana on the driver's side floorboard.

Sergeant Schafer was informed that there was a call about a shooting on Orr Street and that it could be related to his shooting victims. Upon arrival at the scene, Sergeant Schafer noticed a pool of blood on a driveway and a telephone pole that appeared to have been struck. Sergeant Schafer found shell casings in the yard in front of the duplex. Sergeant Schafer and some deputies entered the house looking for additional victims. The house appeared "messy, ransacked," and there were bullet holes in the wall near the door. Officers found pieces of duct tape and several zip ties that had been connected and then cut in both sides of the duplex; no fingerprints were found on these items. Officers also found a red-handled broom, a wood baseball bat, an aluminum baseball bat, and a steel pipe with a sledgehammer on one end. The State and Defendant stipulated that the broom was tested by the Tennessee Bureau of Investigation for DNA but that no profile was obtained due to insufficient or degraded DNA in the areas tested.

Later that evening, C.M. turned himself in to the police. After waiving his rights, C.M. admitted to the shooting and explained what had happened. Based on what C.M. told him, Sergeant Schafer believed that the shooting was in self-defense and released

---

[4] In Sergeant Schafer's testimony, he described the vehicle as a Chevy Impala; however, the photographs admitted into evidence clearly show that it was a Chevy Malibu.

C.M. Sergeant Schafer also spoke to Mr. Manuel and R.J., and they both gave statements and identified the individuals responsible for the robbery.

On cross-examination, Sergeant Schafer testified that he did not find a handgun inside of the vehicle at the firehouse or near the duplex. Sergeant Schafer eventually spoke to Codefendant Davis, who initially denied any involvement. During re-direct examination, Sergeant Schafer read from Codefendant Davis's statement where he admitted that he was present during the seven-hour ordeal.

Codefendant Davis testified against Defendant after waiving his right against self-incrimination. Codefendant Davis admitted that he was charged with the same offenses as Defendant. Codefendant Davis stated that the State had not made him any promises of a reduced sentence if he testified but that he was hopeful that he would receive some consideration.

Codefendant Davis testified that he had known Defendant for several years and that they were both members of the Grape Street Crips.[5] Defendant approached Codefendant Davis about going on a "mission" to take over the neighborhood drug trade. Codefendant Davis knew that Mr. Manuel and R.J. sold some marijuana and suggested they go to Orr Street to rob them. Defendant, Codefendant Davis, and Defendant's "compadre," who Codefendant Davis did not know, were all armed with weapons supplied by Defendant. A fourth person drove the men in a red car.

When they got to the duplex on Orr Street, Codefendant Davis went in the house first because the victims knew him. R.J. let Codefendant Davis in, and Codefendant Davis asked to buy some marijuana from Mr. Manuel. The "compadre" came in after Codefendant Davis, and R.J. began to tussle with him for the gun. Codefendant Davis pulled out his gun, pointed it at Mr. Manuel, and ordered him to get down. Defendant had also entered the house with a gun and a bag of zip ties and duct tape. They locked the door and tied up the victims. The men were telling the victims that they wanted the victims to "break bread," or share their drug profits, with them. Mr. Manuel told them they could get more money from his marijuana supplier. The men forced Mr. Manuel to call his supplier, but he never arrived.

Defendant punched R.J. several times, and the "compadre" punched Mr. Manuel. Codefendant Davis denied hitting anyone but explained that he made sure "nobody ain't getting killed because I ain't going to do no killing, especially when I know these guys ain't working with nothing." Eventually, Mr. Manuel was forced to call C.M. to lure him

---

[5] The trial court conducted a 404(b) hearing outside the presence of the jury and found that testimony regarding Defendant's gang affiliation was relevant to motive and intent. Defendant does not challenge this ruling on appeal.

over by asking him to come and smoke a blunt. C.M. came over around 7:00 or 7:30. Codefendant Davis shut the door behind C.M., and the other man told him to get down. C.M. was also tied up with zip ties and duct tape. The "compadre" dropped a sledgehammer on C.M.'s feet "to make him feel a little pain." Codefendant Davis denied that he extinguished a cigarette on C.M.

The three men held the victims for seven to ten hours. Codefendant Davis explained that they were there for so long because they were waiting for Mr. Manuel's supplier to show up. They took some money and some drugs from R.J., and Defendant took the victims' identifications. Codefendant Davis said that Defendant got some cocaine out of R.J.'s buttocks. The "compadre" went to the other side of the duplex where he and Christopher Samples ransacked the place and stole some of C.M.'s property. At one point, Defendant and "his compadre" "used broomsticks to put in their ass and spank them and everything." They used a phone to record C.M. and R.J. "with their pants down with the broom in them." They threatened to upload the video to YouTube if the victims went to the police.

On cross-examination, Codefendant Davis said that "[w]hen the other guy came in behind me, and him and [R.J.] got into it, [Mr. Manuel] knew what was going on then." Codefendant Davis explained that Mr. Manuel "knew what was going to happen 'cause they - - they - - him and [Defendant], they kicked it prior. They was together a few days prior, talking about the same thing basically, about his supplier." Codefendant Davis explained that Mr. Manuel "probably couldn't predict the torture and stuff that was going to happen right then and there, but he knew it was a robbery going to happen because he was going to set up . . . his contact." Codefendant Davis said that Mr. Manuel was smoking marijuana with the three men "like nothing ain't going on, like he was at a party." Codefendant Davis said that Mr. Manuel acted like the host of a party for two hours before he was also tied up. Codefendant Davis said that he did not know if one of the other men cut Mr. Manuel loose before they left.

The jury convicted Defendant of one count of aggravated kidnapping of Mr. Manuel, two counts of especially aggravated kidnapping of R.J. and C.M., two counts of aggravated rape of R.J., two counts of aggravated sexual battery of C.M., three counts of aggravated robbery, one count of aggravated burglary of Mr. Manuel's home, and one count of employing a firearm during the commission of a dangerous felony. The trial court merged the two convictions for aggravated rape of R.J. into a single conviction for aggravated rape, as well as the two convictions for aggravated sexual battery of C.M. into a single conviction of aggravated sexual battery. After a sentencing hearing, the trial court sentenced Defendant to forty years for each count of especially aggravated kidnapping and aggravated rape; twenty years for aggravated kidnapping, aggravated sexual battery, and each count of aggravated robbery; and ten years for aggravated burglary and employing a firearm during the commission of a dangerous felony. The

trial court ordered all sentences to be served consecutively, for a total effective sentence of 240 years.

## *Analysis*

On appeal, Defendant argues (1) that Count 7 of the indictment was fatally defective and should be dismissed; (2) that the evidence was insufficient to support his convictions and that his kidnapping convictions violated the protection against double jeopardy; (3) that the trial court erred in failing to instruct the jury that it could consider Mr. Manuel as an accomplice whose testimony must be corroborated; and (4) that the trial court erred in ordering Defendant's sentences to be served consecutively.[6] We will address each issue in turn.

## *I. Amendment of Indictment*

Defendant argues that Count 7 of the indictment should be dismissed for improperly naming both R.J. and C.M. as victims of a single count of aggravated rape. Defendant asserts that the indictment was constitutionally defective because he lacked notice of the charges against him. The State responds that Count 7 was properly amended prior to trial to reflect only C.M. as the victim of that count of aggravated rape.

An accused has a constitutional right to be informed of the nature and cause of the accusation against him or her. U.S. Const. amend. VI, XIV; Tenn. Const. art. I, § 9. An indictment must provide sufficient information "(1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997).

Under Tennessee Rule of Criminal Procedure 7(b), an indictment may be amended without the defendant's consent if it is done before jeopardy attaches and "if no additional or different offense is thereby charged and no substantial rights of the defendant are thereby prejudiced." In a jury trial, jeopardy attaches when the jury is sworn. *See State v. Huskey*, 66 S.W.3d 905, 914 (Tenn. Crim. App. 2001) (citing *State v. Knight*, 616 S.W.2d 593, 595 (Tenn. 1981), *cert. denied*, 454 U.S. 1097 (1981)). The general rule appears to be that amendments to correct errors in the victims' names are permissible as they do not cause the defendant to be charged with additional or different offenses. *State v. Hensley*, 656 S.W.2d 410, 413 (Tenn. Crim. App. 1983) (citing Wharton's *Criminal Procedure* § 364 (12th ed. 1975)); *see also State v. Preston Carter*, No. 02C01-9504-CR-00100, 1996 WL 417669, at *2 (Tenn. Crim. App. July 26, 1996), *no perm. app. filed*.

---

[6] For clarity, we have reordered and renumbered the issues raised in Defendant's brief.

In this case, after the jury had been selected, the prosecutor informed the trial court that Count 7 improperly listed both R.J. and C.M. as victims and requested an amendment to the indictment to correct the error. Defense counsel did not object to the amendment and, in fact, expressed a preference for a substitute page to be included in the copy of the indictment sent to the jury. The trial court granted the State's oral request to amend Count 7 of the indictment, specifically finding that "[i]t is not to the prejudice of the Defendant" and that the correct count did not charge "any new or different offenses; it's just to correct a typographical error." The jury was sworn the following morning, and the amended indictment was presented to them.

The amendment to the indictment was allowed before the jury was sworn; therefore, jeopardy had not yet attached. Because C.M. was listed as a victim both before and after the amendment of the indictment, Defendant was not prejudiced in making pretrial investigation and was not surprised as to the offense for which he was charged. *See State v. McClennon*, 669 S.W.2d 705, 706 (Tenn. Crim. App. 1984). But for the removal of an additional victim's name, both the pre-amendment and the post-amendment indictment were identical in charging, with the same language, the offense of aggravated rape while being aided or abetted by another. Defendant was, therefore, on notice of the offense and the particular misconduct for which he was charged. The trial court did not err in allowing the State to amend the indictment in Count 7, and Defendant's argument that the indictment is defective is meritless.

## II. Sufficiency of the Evidence

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Furthermore, questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters

- 10 -

entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). This is because the jury has "the benefit of hearing witness testimony and observing witness demeanor." *State v. Robinson*, 400 S.W.3d 529, 533 (Tenn. 2013). As the Tennessee Supreme Court explained almost half a century ago:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). Therefore, "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id.*; *Dorantes*, 331 S.W.3d at 379.

## A. Kidnapping

Defendant argues that his convictions for kidnapping violate the constitutional protection against double jeopardy and that, under the holding in *State v. White*, 362 S.W.3d 559 (Tenn. 2012), the evidence was not sufficient to prove that the confinement of the victims was not merely incidental to the sexual assaults and robberies. The State responds that the jury was properly charged with the *White* factors and that the evidence is sufficient to support separate convictions of especially aggravated kidnapping, aggravated kidnapping, aggravated rape, aggravated sexual battery, and aggravated robbery.

A person commits especially aggravated kidnapping "who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty," T.C.A. § 39-13-302, and who accomplishes such unlawful removal or confinement "with a deadly weapon" or where the victim suffers "serious bodily injury." T.C.A. § 39-13-305(a)(1), (4). Aggravated kidnapping is the unlawful removal or confinement of another with "the intent to inflict serious bodily injury on or to terrorize the victim," where the victim suffers "bodily injury," or while the defendant is "in possession of a deadly weapon or threatens the use of a deadly weapon." T.C.A. § 39-13-304(3), (4), (5).

In *White*, the supreme court utilized a due process analysis to interpret the element of substantial interference with the victim's liberty. 362 S.W.3d at 577-78. The *White* court held that the removal or confinement must be "to a greater degree than that necessary to commit" an accompanying offense, such as robbery, rape, or assault. *Id*. at 580. The *White* court eliminated the need for a separate due process analysis on appellate review, and held that "[t]his inquiry . . . is a question for the jury after appropriate instructions, which appellate courts review under the sufficiency of the evidence standard as the due process safeguard." *Id.* at 562 (overruling *State v. Anthony*, 817 S.W.2d 299, 306 (Tenn. 1991)). The court determined that the proper inquiry for the jury is "whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." *Id.* at 578. The court set forth the following jury instruction:

> To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> > the nature and duration of the victim's removal or confinement by the defendant;
> >
> > whether the removal or confinement occurred during the commission of the separate offense;
> >
> > whether the interference with the victim's liberty was inherent in the nature of the separate offense;
> >
> > whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;
> >
> > whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and
> >
> > whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

*Id.* at 580-81. This instruction was later included in the Tennessee Pattern Jury Instructions. 8 Tenn. Prac. Pattern Jury Instr. T.P.I.-Crim. 8.03(a). The absence of a *White* instruction, when warranted, results in constitutional error unless the error was harmless beyond a reasonable doubt. *State v. Cecil*, 409 S.W.3d 599, 610 (Tenn. 2013).

In this case, the jury received the full instruction provided for in *White*.[7] The proof at trial, taken in the light most favorable to the State, established that Defendant, Codefendant Davis, and a third individual entered the home of Mr. Manuel, held the three victims at gunpoint for eight to ten hours, and took property from all three victims. The victims were beaten and threatened. Defendant also sexually assaulted two of the victims, which he recorded on C.M.'s phone and threatened to post online if the victims went to the police. During this ordeal, the victims were bound at the wrists and ankles with zip ties and had duct tape over their mouths and eyes. This confinement lasted for several hours, much longer than the time necessary to commit the other acts of robbery and sexual assault. From this evidence, the jury could have easily concluded that the confinement of the victims prevented them from summoning help and greatly increased the threat of harm. The confinement of the victims in this case was not merely incidental to the robberies and sexual assaults. Therefore, the evidence is sufficient to sustain Defendant's convictions for one count of aggravated kidnapping and two counts of especially aggravated kidnapping.

Defendant frames this issue as both a challenge to the sufficiency of the evidence as well as an alleged violation of the Double Jeopardy Clause. However, our supreme court has held that a due process analysis pursuant to article I, section 8 of the Tennessee Constitution, rather than a double jeopardy analysis, is the proper means of addressing this issue. *White*, 362 S.W.3d at 568 (citing *Anthony*, 817 S.W.2d at 306) ("Because dual convictions for kidnapping and an accompanying offense arising from the same criminal episode would not generally violate double jeopardy provisions under *Blockburger* [*v. United States*, 284 U.S. 299 (1932)], this Court deemed the double jeopardy analysis as inadequate and, therefore, developed an alternative analysis."); *but see State v. Alston*, 465 S.W.3d 555, 568 (Tenn. 2015) (Bivins, J., concurring) (expressing concern that both *Anthony* and *White* "utilize the Tennessee Constitution's due process clause to address an issue which more properly may fall within the ambit of the federal and state

---

[7] Defendant asserts in his appellate brief that the trial court failed to give the entire instruction by omitting the list of factors the jury could consider when determining whether the removal or confinement was to a greater degree than necessary to commit the accompanying offense. *See White*, 362 S.W.3d at 580-81. However, the portion of the transcript cited by Defendant is the trial court's instruction on aggravated kidnapping, and the trial court instructed the jury that it "shall use the same factors and rules as those explained in the Especially Aggravated Kidnapping instructions." Because the factors are the same regardless of whether the defendant is charged with especially aggravated kidnapping or aggravated kidnapping, this reference to the prior instruction, which included all of the *White* factors, properly informed the jury as to the law it was to apply in this case.

constitutions' protection against double jeopardy"). However, even if we were to apply a double jeopardy analysis, Defendant's claim still fails.

The basic question in a double jeopardy analysis is whether the offenses in question constitute the "same offense." *See State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *abrogated on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)). To determine whether two convictions actually punish the same offense, we must apply the two-pronged test laid out in *Blockburger*. *Watkins*, 362 S.W.3d at 556. Multiple convictions do not violate double jeopardy if "[t]he statutory elements of the two offenses are different, and neither offense is included in the other." *State v. Black*, 524 S.W.2d 913 (Tenn. 1975); *see also State v. Smith*, 436 S.W.3d 751, 767 (Tenn. 2014) ("If each offense contains an element that the other offense does not, the statutes do not violate double jeopardy."). Our supreme court has held that "[t]he essential elements of kidnapping and robbery are obviously separate and distinct, and simultaneous convictions on these two charges would not necessarily violate the rule in *Blockburger*." *Anthony*, 817 S.W.2d at 303; *see also State v. Jerome Maurice Teats*, No. M2012-01232-CCA-R3-CD, 2014 WL 98650, at *24 n.13 (Tenn. Crim. App. Jan. 10, 2014) (noting that "federal courts expressly have rejected Fifth Amendment double jeopardy attacks on dual convictions for kidnapping and an accompanying felony" (citations omitted)), *aff'd.*, 468 S.W.3d 495 (Tenn. 2015). The same holds true for the elements of aggravated rape. *Compare* T.C.A. § 39-13-304(a) & 305(a) (elements of aggravated and especially aggravated kidnapping), *with* T.C.A. § 39-13-402(a) (elements of aggravated robbery), *and* T.C.A. § 39-13-502(a) (elements of aggravated rape). Therefore, there was no violation of the protection against double jeopardy, and Defendant is not entitled to relief.

## B. Other Charges

Defendant did not challenge the sufficiency of the evidence with respect to his other convictions in his initial appellate brief. In his reply brief, Defendant states that the evidence introduced at trial "was insufficient to sustain each and every count of the jury's verdict" and makes passing references questioning the sufficiency of the evidence with respect to his convictions for aggravated rape—arguing that the testimony of the victims was inconsistent as to whether penetration actually occurred.[8] However, this Court has held that "[i]ssues raised for the first time in a reply brief are waived." *State v. Walter Francis Fitzpatrick, III*, No. E2014-01864-CCA-R3-CD, 2015 WL 5242915, at *8 (Tenn. Crim. App. Sept. 8, 2015) (citing *State v. Franklin Sanders*, No. 02C01-9305-CR-00102,

---

[8] We note that victim C.M. equivocated as to whether Defendant actually penetrated his anus with the broomstick. However, the jury found Defendant guilty of the lesser included offense of aggravated sexual battery with respect to victim C.M., which merely requires "sexual contact with a victim by the defendant," rather than penetration. T.C.A. § 39-13-504. Defendant was convicted of the aggravated rape of R.J., who testified that Defendant did penetrate his anus with his finger.

1994 WL 413465, at *10 (Tenn. Crim. App. Aug. 10, 1994), *aff'd*, 923 S.W.2d 540 (Tenn. 1996), and *Regions Fin. Corp. v. Marsh USA, Inc.*, 310 S.W.3d 382, 392 (Tenn. Ct. App. 2009)), *perm. app. filed*. A reply brief is a response to the arguments of the appellee; it is not a vehicle for raising new issues. *Owens v. Owens*, 241 S.W.3d 478, 499 (Tenn. Ct. App. 2007); *see also Caruthers v. State*, 814 S.W.2d 64, 69 (Tenn. Crim. App. 1991) (noting that allowing an appellant to include a new argument in a reply brief "would be fundamentally unfair as the appellee may not respond to a reply brief"). We will not address an issue raised by Defendant for the first time in his reply brief. Moreover, in the light most favorable to the State, the evidence is clearly sufficient to sustain each of Defendant's convictions. Accordingly, we affirm the judgments with respect to Defendant's convictions for aggravated rape, aggravated sexual battery, aggravated robbery, aggravated burglary, and employing a firearm during the commission of a dangerous felony.

## III. Accomplice Instruction

Defendant argues that the trial court erred by refusing to instruct the jury that it could consider Mr. Manuel as an accomplice to the crimes as a matter of fact. The State responds that the trial court did not err in denying Defendant's request for the instruction because, even if Mr. Manuel had some knowledge of Defendant's plan to commit a robbery, this was not enough to elevate Mr. Manual to the status of an accomplice.

It is well-recognized that a defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *see State v. Leath*, 461 S.W.3d 73, 105 (Tenn. Crim. App. 2013). When reviewing jury instructions on appeal to determine whether they are erroneous, this Court must "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id.* Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. *Carpenter v. State*, 126 S.W.3d 879, 892 (Tenn. 2004); *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001).

A defendant cannot be convicted solely on the uncorroborated testimony of an accomplice.[9] *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013). An accomplice is "one

---

[9] Only slight corroboration of an accomplice's testimony is required. *See Hawkins v. State*, 469 S.W.2d 515, 520 (Tenn. Crim. App. 1971). "[C]orroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the

who knowingly, voluntarily, and with common intent with the principal unites in the commission of a crime." *State v. Jones*, 450 S.W.3d 866, 888 (Tenn. 2014). The test for whether a witness qualifies as an accomplice is whether he or she could be indicted for the same offense charged against the defendant. *Id.* When the evidence is clear and undisputed that a witness participated in the crime, then the trial court must declare the witness to be an accomplice as a matter of law and instruct the jury that the witness's testimony must be corroborated. *State v. Bough*, 152 S.W.3d 453, 464 (Tenn. 2004). On the other hand, when the facts of a witness's participation in a crime are in dispute or susceptible to an inference that a witness may or may not be an accomplice, it then becomes a question of fact for the jury to decide. *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). Whether a witness qualifies as an accomplice is a question of law, which is subject to de novo review without any presumption of correctness. *State v. Robinson*, 146 S.W.3d 469, 509 (Tenn. 2004).

In this case, the trial court determined that Codefendant Davis was an accomplice as a matter of law because he was charged with the same offenses as Defendant.[10] However, Defendant has not shown that the facts in this case are susceptible to the inference that Mr. Manuel also may have been an accomplice. There was no testimony that Mr. Manuel took part in the planning or benefitted in the proceeds of the robbery. At most, Codefendant Davis's testimony indicated that Mr. Manuel may have been aware that a robbery was going to occur; however, Codefendant Davis was not clear whether this awareness came from prior discussions between Defendant and Mr. Manuel or from the fact that three men entered Mr. Manuel's home late at night with guns. There was no indication that Mr. Manuel shared a common intent with Defendant and his cohorts. As the trial court noted, the jury could not find that Mr. Manuel was, "in fact, an accomplice because there's nothing on the record that would indicate that Mr. Manuel participated or intended for himself to be tied up, to be held for hours, to be beaten, to have his property taken from him, including his I.D. and his cell phone." Though Mr. Manuel made phone calls to lure his marijuana supplier and C.M. to the house, he testified that Defendant forced him to do so at gunpoint. Defendant asserts that Mr. Manuel was not treated as harshly as the other victims because he was not sexually assaulted with the broomstick. However, Mr. Manuel testified that his pants were pulled down but that Defendant stopped the other men from doing anything to him because Defendant knew that Mr. Manuel was not likely to snitch. From this evidence, it is clear that Mr. Manuel was a victim of Defendant's crimes, not an accomplice. Therefore, no corroboration of Mr. Manuel's testimony was required, and the trial court did not err in not giving the jury such an instruction.

---

commission of the crime charged." *Jones*, 450 S.W.3d at 888 (quoting *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001)) (emphasis omitted).

[10] On appeal, Defendant did not argue that there was insufficient corroboration of Mr. Davis's testimony; therefore, we will not address this issue.

*IV. Consecutive Sentences*

Defendant contends that the trial court erred by ordering his sentences to be served consecutively. The State responds that this issue is waived for failure to cite legal authority. We agree with the State.

In Defendant's appellate brief, he cites *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012) for the standard of review with regards sentencing, as well as the statutory factors a trial court should consider in determining the length of the sentence. *See* T.C.A. § 40-35-210(a), (b), -103(5). Defendant does not cite any relevant legal authority to support his claim with regard to the consecutive alignment of his sentences. In fact, Defendant's entire argument is a single sentence setting forth the factors the trial court should consider when determining the length of a sentence without any references to the record or argument as to how the trial court erred in imposing consecutive sentences.

An appellate brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on." Tenn. R. App. P. 27(a)(7). Failure to do so results in waiver of the issue. *See* Tenn. Ct. Crim. App. R. 10(b) (stating that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court"). Therefore, Defendant has waived the issue and is not entitled to relief.[11]

*Conclusion*

Based on the foregoing, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE

---

[11] In Defendant's reply brief, he concedes that the issue is waived and does not argue for the application of plain error review. Therefore, we will not address the merits of this issue.